## Supreme Court—Appellate Division—First Department.

January, 1903.

## THE PEOPLE v. EDWARD G. GLENNON.[1]

(78 App. Div. 271.)

1. POLICE—FAILURE TO SUPPRESS DISORDERLY HOUSE.

It is not error for the court, upon the trial of an ·indictment charging a police officer with wilfully failing to observe and inspect a house of ill-fame within his precinct, to refuse to charge, " The defendant might have had the strongest moral certainty in the world that the house No. 148· West 33d street was a house of prostitution, yet if he did not know of somebody who can swear of his own knowledge to the facts of which the defendant was morally certain, the defendant had no right to make an arrest. Such an arrest would have been wanton and an indefensible act of false imprisonment." Such a request to charge eliminates the element of the defendant's personal knowledge of the character of the house.

2. SAME.

As the defendant's duty in the premises was not limited to making an arrest, the court properly refused to charge that " the defendant would not have been justified in making an arrest, based upon no other evidence than that of the reputation of the house No. 148 West 33d street as a disorderly house, house of ill-fame, or house of prostitution, nor upon evidence insufficient in law to secure a conviction, should he have made such an arrest," especially where the jury had previously been instructed that the defendant could not be convicted unless he had evidence regarding the character of the house.

3. SAME—PENAL CODE, SEC. 117.

A police officer who has personal knowledge of the existence of a house of prostitution is bound to observe and inspect the house and to repress and restrain all unlawful conduct or practice therein, and arrest the person maintaining it whether he knew of anybody else who could swear to the fact or not, and a failure to do so makes him guilty of a misdemeanor under section 117 of the Penal Code.

4. SAME—PRESUMPTION OF INNOCENCE.

Where the court charges that the presumption of innocence " renders it unnecessary for the defendant to testify as a witness to his innocence," and that " to overthrow this presumption of innocence there must be legal evidence of guilt carrying home to the mind of

---

[1] Affirming 16 N. Y. Crim. Rep. 298; see People v. Herlihy, 16 N. Y. Crim. Rep. 235.

every juror a degree of conviction short only of absolute certainty," is is not improper for the court to refuse to further charge that " this presumption of innocence is legal proof or evidence."

APPEAL by the defendant, Edward G. Glennon, from a judgment of the Court of General Sessions of the Peace in and for the city and county of New York in favor of the plaintiff, entered on the 27th day of December, 1901, convicting the defendant, a police officer of the city of New York, of the crime of willful neglect of duty.

Ira Leo Bamberger, for the appellant.

Howard S. Gans, for the respondent.

INGRAHAM, J.:   The defendant, a police officer of the city of New York, was indicted for willful neglect of duty in neglecting to carefully observe and inspect and to use and exercise all proper, reasonable and effective means within his power for the prevention of the keeping and maintenance of a house of ill-fame and a house of prostitution in the city of New York, and for the detection and arrest of the person keeping and maintaining the same.   The defendant was convicted, and upon this appeal relies upon exceptions taken to the charge of the court to rulings upon refusals to charge and to rulings upon questions of evidence.   The record is quite voluminous, and there are many objections and exceptions which are not insisted upon by counsel for the appellant, and which it will not be necessary to discuss.   We have carefully examined this whole record, however, and can find no exception that, in the view that we take of the case, would justify us in reversing the judgment. The defendant was attached to the nineteenth precinct as a patrolman, detailed by his superior officers to duty in citizen's dress.   His special duty was to examine and report, under the direction of the captain of the precinct, upon disorderly houses and other like violations of law.

On or about the 31st day of May, 1901, the police department received a communication from an officer of the Society for the Prevention of Crime, which stated that No. 148 West Thirty-third street was a disorderly house; that it had been open for some time; that inmates thereof had accosted men from the stoop, and requesting that the house be closed. This communication appears to have been referred to the inspector of the district in which this precinct was situated, and was by the inspector referred to the captain of the precinct, with instructions to make a thorough and careful investigation of the matter, and to use all lawful means to remove the evil, if such evil was found to exist. Within an hour or two after the captain received this notice, on June 7, 1901, he told the defendant, with the other officers who were attached to the precinct and assigned to duty in citizen's dress, that he had received a complaint from the Society for the Prevention of Crime of the existence of a disorderly house at 148 West Thirty-third street, and instructed the defendant and the other officers to investigate the complaint, and to use all proper means at their command to ascertain whether the house was as charged in the complaint. Subsequently the defendant reported to the captain that he had been to the house and had endeavored to obtain evidence, and had not obtained it; that he went there a number of times and watched the house from the outside to see if there was any evidence of a disorderly house, without discovering any, and had been there a number of times and tried to get in, but was refused admittance. The defendant subsequently made like reports to the captain in relation to this house, and nothing was done by the defendant or the police of his precinct to suppress the house. It would seem that the defendant was on duty from the 7th of June to the 9th of August, 1901, with the exception of two days. On the 9th of August this house was raided, when its character was at once demonstrated, and arrests were made. A witness who resided at No. 146 West Thirty-third street, next door to the house in question, was called by

the prosecution and testified that the house 148 West Thirty-third street had been a disorderly house for three years; that from the 1st of January, 1901, to the time when the house was closed in August, there was a woman on the stoop day and night; that she called to every man that passed by; that the witness had heard her invite men in the house; that she had invited the witness in; that there was hardly a time when the witness passed but that he had not been hissed at to come in; that they were dancing and singing in the house all night; that when the windows were open in the summer he could, in the adjoining house, hear constant singing and music coming from the house in question; that the women were in the habit of coming to the windows partially undressed; that he passed the house five or six times a day, and when on the stoop of his own house could see men going in and out by the dozens, and women on the stoop inviting them in; and that this was going on openly day and night. Another witness, who lived at 146 West Thirty-third street, testified that she had observed this house from the 1st of January until the commencement of June, when she left; that she heard dancing, music and carrying on all night; that there were women at the windows calling men in as they passed, and that there was a woman on the stoop day and night calling men in; that women stood on the stoop day and night soliciting and beckoning men to come in, and that she saw men go in the place constantly. Another witness, who resided in the same house, testified that she had observed this house, 148 West Thirty-third street, for about a year before August 9th; that there was dancing, singing and carrying on there until 4 o'clock in the morning, so that the witness could not sleep; that this went on nearly every night up to the time the house was closed; that the women at the windows and on the stoop were lightly dressed; and that this continued from the 1st of January to August, when the house was suppressed. Another woman, who had lived at the same house for one year, testified that she saw men constantly going into 148 West Thirty-third

street; that she saw girls sitting at the windows calling the men in; that this was kept up day and night until 2 or 3 o'clock in the morning. Another woman, who resided at 146 West Thirty-third street, testified that from the 1st of January, 1901, to August, 1901, she saw men being solicited from the windows and from the doors all hours in the day and in the early hours in the morning and at night; that she noticed a woman on the stoop calling the men in, besides the women in the windows; that the witness had reported this house to the police, but could not specify the officer. An officer for the Society for the Prevention of Crime testified that he visited this house, 148 West Thirty-third street, on the 11th of June at about half-past 11 at night in company with another officer of the society; that they were admitted to the house by a woman and taken into the parlor, where eight women were seated; that he was asked by one of the women to treat, which he did; that he and his companion were solicited by women in the house and that there were several other men on the premises while they were there; that between the 1st of January and the 1st of August he had passed through this street several times and had noticed women sitting on the stoop soliciting men to come in, and his testimony is corroborated by the other officer who accompanied him to the house. Another witness connected with the same society testified that he had known the defendant about ten years, and that during all that time he was a police officer; that in the latter part of May or June, 1901, he had a conversation with the defendant on the southwest corner of Thirtieth street and Sixth avenue; that the defendant stated to the witness that certain pool-rooms were going to be opened and that they would like to be protected from interference by the Society for the Prevention of Crime, and if such a thing could be done there would be good money in it; that the witness told the defendant that he would see what he could do; that some time in June he again saw the defendant; that at that interview the defendant said that the superintendent of the society had been to the sta-

tion house with a complaint against 148 West Thirty-third street; that it had been referred to headquarters and they wanted an investigation made, and he would like to find out what the society people wanted done with it; that the place had run for about three years and they would like to have it continue to run if possible; that the woman ran a quiet place and he did not like to interfere with her unless it was absolutely necessary; that the witness again saw the defendant a week or two weeks after; that at that time the witness told the defendant that Dillon, an officer of the society, had said that the society was not going to raid any disorderly house unless they had orders from the executive committee to do so, and he guessed it would be all right to run, to which the defendant said all right, and asked the witness to call at the station house and let them know if any raid was intended by the society; that he subsequently had another talk with the defendant, at which he said that he had received a message from Dillon that the society was going to raid the place; that subsequently, on the 7th day of August, in consequence of a telephone message, he saw the defendant, and that time the defendant gave the witness a $100 bill, and said that it was a present from No. 148 West Thirty-third street. Dillon, who was an officer of the Society for the Prevention of Crime, testified that he visited this house, 148 West Thirty-third street, several times between the 1st of January and August, when the house was raided; that women were soliciting from the house; that on August 9th the agents of the society entered the house and arrested the keeper and took her to the station house. The superintendent of the society, who made the complaint to the police, testified that he had occasion to observe this house from the 1st of May down to the time it was closed in August; that whenever he observed the house there was a woman on the stoop calling to men as they passed; that at other times during the winter there were women tapping on the windows, calling attention of men and asking them to come in; that the witness was in the house

in April; saw six or seven women in the parlor, with several men there; that men and women were talking and drinking together, and that he heard women ask men to take them upstairs, saying that the cost would be $2; that he went into the house on August 8th at 11:30 o'clock, when the house was raided and the proprietor arrested.

I have detailed at length this evidence to show the public character of the house and what transpired from the windows and stoop opening upon the public street; that the officers of this society had no difficulty in obtaining entrance to the house, and that entrance once obtained its character was apparent would seem to be from this evidence conclusively established. In fact, it would appear that the only persons who had any difficulty in obtaining complete knowledge of the character of this house were the police officers charged with the duty of observing and inspecting the house and suppressing it; and if this testimony is true, and certainly the jury had a right to credit it, a slight observation by a police officer should necessarily have disclosed the character of the house and furnished him with the evidence to justify him in applying for a warrant for the arrest of those engaged in maintaining and operating it. The defendant and several other police officers attached to this precinct testified as to their efforts to obtain evidence as to the character of this house, and that they were unable to succeed, and other persons who were in the habit of passing through this street testified that they had failed to observe any evidence that the house was of the character described.

The duty imposed by law upon this defendant is specified in section 315 of the Charter of the city of New York (Laws of 1897, chap. 378, as amd. by Laws of 1901, chap. 466). That section provided: "It is hereby made the duty of the police department and force, at all times of the day and night, and the members of such force are hereby empowered, to . . . carefully observe and inspect . . . all houses of ill-fame or prostitution, and houses where common prostitutes resort or

reside, . . . and to repress and restrain all unlawful and
disorderly conduct or practices therein;" and to suppress and
prevent the violation of all laws and to arrest all persons guilty
of violating any law for the suppression or punishment of
crime. And it was a willful neglect in the performance of this
duty by the defendant for which he was indicted and of which
he has been convicted. This duty imposed upon the defendant
was not solely to arrest in case a violation of the law had been
committed in his presence. There was specifically imposed
upon him the duty to carefully observe and inspect all houses
of ill-fame or prostitution, and to repress and restrain all unlaw-
ful and disorderly conduct or practices therein, and to arrest
all persons guilty of violating any law for the suppression or
punishment of crime. Knowledge that a complaint had been
made against this house was communicated to the defendant
by his superior officer and he received directions to inspect this
house and to obtain evidence of its character if possible. In
the face of the evidence offered by the prosecution, if that evi-
dence is to be credited, it is perfectly clear that this officer
either failed in his duty to observe and inspect this house, for
the most casual inspection would have disclosed to him facts
which would clearly have established the character of the house;
or, having inspected and ascertained its character, he failed to
report what he observed to his superior officer, and failed to
perform the duty that then rested upon him of obtaining a
warrant for the arrest of the keeper of the house, or of himself
making an arrest. He was indicted both for failing to inspect
and observe the house, and also for failing to suppress it or
arrest the inmates, and if the evidence of these witnesses called
by the prosecution is to be believed, the conclusion irresistibly
follows that the defendant willfully neglected his duty in one
or the other of the particulars mentioned. If the testimony
of Whitney is true, the motive of the defendant in thus neglect-
ing his duty as a police officer is quite apparent. To sustain
this conclusion it is not necessary to show that this defendant

had personal knowledge of the character of the house such as would justify him in arresting any one upon the premises without a warrant, and failed to make an arrest. What he was bound to do was to observe and inspect the house and to repress and restrain all unlawful conduct or practices therein. For a failure to perform either of these duties he was guilty of a misdemeanor under section 117 of the Penal Code. If, instructed by his captain to inspect and observe this house and report upon its character, he failed to perform that duty and made a false report to his captain, he would be guilty of a violation of this section of the Penal Code. If he inspected it and ascertained its character, as from the evidence offered by the prosecution he necessarily would have done, it was his duty to report the facts to the captain, and, if the evidence was not sufficient to justify him in arresting any particular individual, to obtain a warrant for the arrest of the person who was the owner or keeper of the house. He could have repressed or restrained the commission of illegal acts upon the premises by obtaining a warrant for the arrest of those keeping the house, when he had obtained knowledge of facts which would justify the inference that the house was a disorderly house within the meaning of the statute, and assuming that the witnesses for the prosecution testified truthfully to the occurrences there, it is impossible to believe that the defendant could have made any serious effort to obtain evidence as to the character of the house without the discovery of such facts as would justify him in applying for a warrant.

In submitting the case to the jury the court, after reading to them the section of the charter to which attention has been called, and the section of the Penal Code under which the defendant was indicted, said, " if any one of the three questions of fact which I will submit to you be not proven to your satisfaction beyond a reasonable doubt, the defendant cannot be found guilty. If all three are proven to your satisfaction beyond a reasonable doubt, he should be convicted of the charge

against him." These three questions were, first, " Was the house number 148 West Thirty-third street a house of ill-fame, resorted to or occupied by women for lewd purposes?" The second, " Did the defendant have knowledge of its character? " and, third, " Did he, with knowledge of its character, willfully neglect and omit to perform the duty enjoined upon him by law in reference to that house? " The court thus imposed upon the prosecution the obligation of proving, beyond a reasonable doubt, that the defendant had knowledge of the character of this house, and, with knowledge of its character, willfully neglected and omitted to perform the duty enjoined upon him by law with reference to it. This certainly was as favorable a view of the law as the defendant was entitled to. The court then, at the request of the defendant, charged: " In order to obtain a warrant for the arrest of any person the defendant must make an oath. In order to make an oath he must know that what he swears to is true, and in order to swear to it he must have evidence, and without evidence the whole foundation of the prosecution fails," and that the omission or neglect in order to be willful, within the meaning of the statute, must be with knowledge and with criminal intent. There was no exception to the charge, and the only exceptions taken by the defendant were to the refusals to charge certain requests. The defendant relies upon exceptions to refusals to charge the sixth and ninth requests. The sixth request is: " The defendant might have had the strongest moral certainty in the world that the house No. 148 West 33d street was a house of prostitution, yet if he did not know of somebody who can swear of his own knowledge to the facts of which the defendant was morally certain, the defendant had no right to make an arrest. Such an arrest would have been wanton and an indefensible act of false imprisonment." This the court refused in the language requested. The ninth request was: " The defendant would not have been justified in making an arrest based upon no other evidence than that of the reputation of the house No. 148

West 33d street as a disorderly house, house of ill-fame or house of prostitution, nor upon evidence insufficient in law to secure a conviction, should he have made such an arrest." This the court also refused to charge. I do not think that, conceding the sixth request to have been pertinent, it contains a proper statement of the law. The defendant was a police officer, and as such had power to arrest a person guilty of a misdemeanor committed in his presence. If he had personal knowledge of the fact that this house was a house of prostitution, it was not only his right but his duty to arrest those maintaining the house. Yet this proposition eliminates this personal knowledge of the defendant. The court was asked to say if the defendant did not know of somebody who could "swear of his own knowledge to the facts of which the defendant was morally certain, the defendant had no right to make an arrest." By section 177 of the Code of Criminal Procedure it is provided that a peace officer may, without warrant, arrest a person for a crime committed or attempted in his presence; when the person arrested has committed a felony, although not in his presence; when a felony has, in fact, been committed, and he has reasonable cause for believing the person to be arrested to have committed it. If this was a disorderly house, and the defendant had personal knowledge of that fact, it was his duty to arrest the person maintaining it whether he knew of anybody else who could swear to the facts or not. This whole case was tried upon the theory that the defendant did have knowledge of the fact that a crime had been committed, and, having such knowledge, willfully refused to make an arrest or suppress the house, as required by law, and it would have been misleading to charge that he was not justified in making an arrest unless he had the evidence of some other person as to the facts to justify the inference that a crime had been committed. But this request to charge was refused in the language proposed, and the court had already charged the jury that to convict the defendant they must find that the defendant

had knowledge of the character of this house. There was evidence that would justify the jury in finding that this defendant had personal knowledge of the character of the house and took an active part in endeavoring to prevent it from being interfered with.

I also think the court was justified in refusing to charge the ninth request. The duty of the defendant was not, under the law, limited to making an arrest, and the court had instructed the jury that, unless the defendant had evidence of the character of the house, " the whole foundation of the prosecution fails." The refusal to charge these requests was not an instruction to the jury that the officer had power to arrest any one in this house without personal knowledge that an offense had been committed, or without having obtained a warrant from a magistrate, and the jury had been correctly instructed upon the duty of the defendant and what the jury must find to justify a conviction, and, in view of the charge as given, we do not think the refusal to charge this request was error.

The next exception relied upon by the defendant is the refusal to charge that "This presumption of innocence is legal proof or evidence." Upon that subject the court charged the jury: " The defendant is entitled to the presumption of innocence, and that presumption rests with him throughout the case and until it be finally overborne by evidence which will satisfy the jury of the guilt of the defendant, and then the presumption is overthrown," and then at the request of the defendant the jury were instructed that " This presumption or proof of innocence created by law renders it unnecessary for the defendant to testify as a witness to his innocence," and " To overthrow this presumption of innocence there must be legal evidence of guilt carrying home to the mind of every juror a degree of conviction short only of absolute certainty." This certainly presented a question of presumption of innocence more strongly than was justified, and the refusal to say that the presumption is legal proof or evidence was not error.

There are many exceptions to rulings upon evidence which are presented in the record, but I do not find that any of them would justify a reversal of this judgment.

Upon the whole case I think the defendant has had a fair trial; that there is no doubt of his guilt and that the jury were justified in the conclusion at which they arrived.

The judgment appealed from should be affirmed.

VAN BRUNT, P. J., O'BRIEN, McLAUGHLIN and HATCH, JJ., concurred.

Judgment affirmed.